## No. 6383.

### A. B. SEELYE VS. ZALMON TAYLOR.

'There having been a partnership between Plaintiff and Defendant, no specific indebtedness resulting therefrom, can be claimed by the former. The only action he can maintain, is one for the settlement of the partnership affairs.

APPEAL from the Sixth District Court, parish of Orleans. *Saucier,* J.

H. N. Ogden for Plaintiff and Appellant.

Merrick, Race & Foster for Defendant and Appellee.

The opinion of the Court was delivered by

TODD, J. The plaintiff sues the defendant for twenty-six thousand dollars.

The suit is based on a contract entered into between the parties, on the 7th of February, 1872. The substance of this contract was that Taylor, the defendant, had purchased asphaltum mines in the Island of Cuba, from the Cuba and Louisiana Mining and Paving Company. The plaintiff, Seelye, was employed to go to Cuba and examine into the titles of the mines, liquidate the indebtedness of the company, for which Taylor was bound, to reconstruct and put the mines in working condition, and to take out and ship asphaltum to all parts where there was any demand for it. Taylor was to furnish all the money to carry out these objects, and, in consideration for his, Seelye's, services, he was to receive one-half of all the profits that might accrue from the sales of mines, products, patents, or otherwise. It was further stipulated that should a partnership be formed between the parties, or others contracting with them, or a corporate body be formed to conduct the affairs of the mines, that each and every one interested should share the profits of the business in proportion to the amounts put in.

The plaintiff alleged that he had performed all the obligations imposed on him by the contract, but that the defendant had failed to per-

form those resting on him ; that the defendant had sold patents to the value of $8000, one cargo of asphaltum for the sum of $4000, had taken control of another shipped by the plaintiff to London, worth $15,000, and had finally sold the mines themselves for $25,000, and one-half of these sums he claimed to be entitled to recover of the defendant.

The defendant first filed an exception, to the effect that the plaintiff could only sue for the settlement of the partnership, which was over-rated.

Subsequently a rule was taken by the defendant on the plaintiff to produce the act of partnership between the parties. A contract of part-nership was produced and filed under the order of the court.

Thereupon the defendant filed a peremptory exception, alleging the existence of the partnership, and denying the right of the plaintiff to claim any specific indebtedness, and averring that the only action he could maintain was one for the settlement of the partnership ; and coupled with this exception was the answer, which substantially con-tained a denial of any liability to the plaintiff, for many reasons as-signed, and which answer was expressly made subject to the exception.

Under these pleadings there was a volume of testimony taken, making a record of more than 600 pages, and testimony, as usual in such cases, of the most conflicting character. There was judgment for the defendant virtually sustaining the exception, and plaintiff appealed therefrom.

This case presents an instance of an unfortunate speculation, and the result that almost always follows such a speculation, of a disagree-ment between the parties thereto, a struggle to save something from the wreck, and an effort upon the part of one or both to repair the common loss, by laying the blame of the failure on the other, and compel him to make good such loss.

We have gone patiently through this record, examined and re-ex-amined every particle of the evidence, and deliberately weighed the con-flicts therein, to ascertain the exact rights of the parties. We have viewed the case in every aspect presented by the record, and we find that, were we to consider and weigh, technically, the acts, declarations and writings of each party, we could establish, by culling from them, all, and more, perhaps, than his adversary has charged against him.

If, at the threshold, we were to view and decide this case as pre-sented by a technical construction of the pleadings, it could be easily dis-posed of. Strictly construed, the claim of plaintiff is based upon that allegation in his petition in which he avers " that in consideration of his services, said Taylor agreed to divide equally with him *all profits* that might accrue from the sale of mines, products, patents or otherwise," The critical examination we have given the evidence, so far from ena-

bling us to discover the profits to divide between the parties, has satisfied our minds that there are nothing but losses to share between them ; losses to the plaintiff of some labor and much valuable time and to the defendant of a considerable amount of money. Let us, however, consider this case, as the plaintiff's counsel contend we should do, as a case in which the pleadings are enlarged by the evidence, and we find substantially the following facts touching the acts and proceedings of the respective parties.

After the execution of this contract declared on in the petition, the plaintiff went to Cuba with money furnished by the defendant. He caused the titles of the defendant to the mines to be translated into Spanish and recorded, and did, we presume, whatever else was necessary to make the titles secure ; he settled the debts of the company from whom Taylor had bought the mines, and for which he seems to have been responsible, on the most advantageous terms ; examined the mines and commenced work in the same, and made to Taylor the most favorable report of the prospects of the business—all of which seems to have given Taylor entire satisfaction at the time. Seelye returned from Cuba to New Orleans, and shortly thereafter both parties went to Cuba. Taylor only remained a few days, but Seelye remained there for more than a month. He again went to the mines, supervised the working of the same, and got out and shipped to London, in his own name, a cargo of several hundred tons.

It seems to have been the understanding between the parties that the plaintiff was to accompany or follow the cargo of asphaltum to London and attend to the sale of it and endeavor to create a market for it if none existed. This we gather from the letters of both parties. The plaintiff, however, did not go to London, but, on his return to the United States, abandoned the enterprise entirely, and announced this fact in a letter to Taylor. The money required for all the expenses incurred was furnished by Taylor, and a considerable debt was created by the shipment of the cargo to London, the freight alone amounting to several thousand dollars.

The grounds assigned by plaintiff, both in his letter and in his oral testimony before the court for abandoning the enterprise, were that the defendant, Taylor, had failed and refused to make him a title to one-half of the mines, as promised.

There was no market in London nor elsewhere for this Cuban asphaltum, only a small portion of that shipped could be sold, and the highest offer made for it was not sufficient to pay the freight and charges on the cargo. It is unnecessary to recapitulate the evidence upon which we base our conclusion on this point. The sale of the asphaltum was a complete failure.

72

The final result was that Taylor sold the mines and received as the price of the same some stock in the company who were to own them, and which he considered worthless, and, to avoid the expense that holding the stock might involve him, returned it to the party from whom he received it.

We have carefully considered the reasons assigned by Seelye for abandoning the concern, with a view to ascertain whether his complaint was well founded. Have considered it as a question of fact as well as of law. Taylor did, in an act of partnership between him and Seelye, dated on the 1st of June, 1872, declare that Seelye was the joint owner of the mines with him, and he subsequently wrote to Seelye, expressly confirming this fact. There is no doubt that this was sufficient to have invested him with the half ownership of the mines. No formal deed was necessary to effect this.

The ownership of the mines did not comprise the ownership of the soil in which the mines were located, as we learn from the evidence in the record, but merely the privilege of working the mines and taking the material or ore therefrom, which privilege, it also appears, was lost or forfeited by an abandonment of the mines for six months.

The mines being situated in the Island of Cuba, the question respecting the title to them must be governed by the laws of Spain. We have carefully examined the Spanish law on this point, and are satisfied that even a verbal sale of the mines would have conferred a legal title. In that part of the Partidas which treats of sales, we find a chapter (VI) bearing this title : "En que manera se debe facer la vendida y la compra ;" and from this chapter we quote the following :

"Compra y vendida se puede facer en dos maneras ; la una es con carta y la atra sin ella." And this principle applies to all kinds of property, movable, or immovable, for, from an examination of the whole subject, as there laid down, we find no distinction, and by an early decision of this Court, in the case of Gonzalez vs. Sanchez, 4 N. S. 658, such was held to be the law of Spain.

It is well to note that this complaint does not seem to have been timely. It was not urged in response to the letter which purported to confirm the right conceded to Seelye in the act of partnership, and we are inclined to believe it would never have become so prominent in his mind, if the conviction had not, about that time, overtaken him, that the mining and shipping of asphaltum was a decided failure, and likely to involve the owners of the mines and cargo in a considerable liability.

If we gave weight to the speculative opinions of witnesses touching the nature of these mines, or even to the speculation that one person, who figures prominently in the history of these mines was, by great

shrewdness, enabled to make out of them, we might come to a different conclusion on this point ; but we prefer to take the actual results of the trials made by the parties to this suit to sell the cargoes shipped, and look at the actual facts, than form our opinions from the speculative estimates of witnesses, and an occasional " lucky hit " made with them by enterprising adventurers.

The Cuban asphaltum, as an article of commerce, was a failure. There is no doubt but that plaintiff and defendant, and others who testified in the case, were at one time of a very different opinion, and sincerely believed in the value of the mines : and we believe, too, that the plaintiff is largely responsible for the favorable impression that the defendant at one time entertained of this enterprise, produced by his favorable representations, after he had visited and examined the mines, and it was mainly from that representation that Taylor was induced to make a further advance of money to work them.

We have thus commented upon the facts of this case, presented in the record, under the view that by the liberal construction of the plead-ings contended for by the plaintiff, it was entirely legitimate to do so. We are, however, of the opinion, that a thorough investigation of all the facts pertaining to this controversy, and a just and complete settle-ment between the parties could only be made by and through an action of partnership. In other words, that the exception filed by the defendant was properly sustained by the *judge a quo.*

The plaintiff swears that the contract of partnership was never car-ried into effect, and some acts and writings of the defendant, to some extent, corroborate this statement. But on a careful consideration of all the evidence, we are satisfied that there was a partnership between the parties, and that their acts and proceedings relating to these mines, after June 1, 1872, are to be considered as done under this contract. There is the contract itself, stipulating clearly the obligations and duties of each party.

The plaintiff gave his notes as stipulated, and delivered them to the defendant. Defendant furnished the money, as he promised to do, to carry out the purposes of the partnership. The mines were worked as provided by the contract. Taylor swears that all this was done under the partnership contract. Seelye acted as the managing partner. He got out a cargo of asphaltum, and shipped it in his own name, which he surely would not have done were he a mere agent.

In several letters written by Seelye to Taylor he makes distinct acknowledgments that this partnership agreement had gone into effect. It is, perhaps, only necessary to quote from one of these letters of Sep-tember 10th, 1872, in which he uses this language :

" Over three months since this contract between you and I was

made, and I have gone on faithfully in the performance of my part of it,. and greatly to the detriment of my personal interests."

He could have referred to no other contract than the one of part-nership.

The power of attorney, given subsequently to the date of this part-nership contract, would seem somewhat inconsistent with a continuance of the partnership, but it seems to have been thought necessary by the attorney in Cuba, who advised the same; and, on considering all the facts relating to it, and the situation of affairs relating to these mines,. and of the parties themselves at the time it was given, we cannot believe that this power of attorney was intended to supplant and did, in fact,. abrogate the partnership.

Entertaining these views, we think the judgment appealed from was correct, and it is, therefore, affirmed with costs.